UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
COREY FRIEDMAN,

                              Plaintiff,                      **MEMORANDUM AND ORDER**
                                                                             CV 08-2801 (WDW)

        -against-

MARK SCHWARTZ,

                              Defendant.
---------------------------------------------------------------X

**APPEARANCES:**

**KENNETH A. ELAN, ESQ.**
Attorney for Plaintiff
217 Broadway, Suite 606
New York, New York 10007

**MARK SCHWARTZ, Pro se**
800 Ocean Drive, #201
Juno Beach, FL 33408

**WALL, Magistrate Judge:**

      Plaintiff Corey Friedman ("Plaintiff") commenced this diversity contract action against Mark Schwartz ("Defendant") to recover a $100,000 loan. Plaintiff alleges that he made a personal loan of $100,000 to Defendant.

      A "Notice, Consent, and Order of Reference for the Exercise of Jurisdiction by a United States Magistrate Judge" was signed by both parties and approved by District Judge Seybert on February 25, 2011. Docket Entry ("DE") [48]. A nonjury trial was held before the undersigned on June 22, 2011. Prior to the trial, the court received a letter from Defendant stating:

> As requested I am notifying you that I will not be able to appear for trial as I do not have the personal financial resources available to appear in person. I again replead my motion for judgment on the pleadings as I believe there is no question there was no meeting of the minds much less any kind of contract to which I was a party. As

> pleaded and stated time and again all investments, or priority loans, were corporate with Harmony on Broadway LLC, not made to me personally. Sadly, I recognize anyone can sue anyone else and if they have no funds to defend they usually lose, but I adopt all prior pleadings and papers to be asserted in my defense.

DE [53].

At trial, Plaintiff testified, as did Paul Auslander ("Auslander"), CEO of American Financial Advisors and Plaintiff's financial advisor. At the court's request, Plaintiff provided a post-trial supplemental affidavit and evidence of a wire transfer. *See* DE 56. Defendant failed to appear at trial and subsequently submitted an untimely opposition to Plaintiff's proposed findings of fact and conclusions of law. Based on the evidence presented, as well as the post trial materials submitted by the parties, the court makes the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure. To the extent that any of the findings of fact may be deemed a legal conclusion, it shall be deemed a conclusion of law, and vice versa.

## I. FINDINGS OF FACT

Plaintiff was introduced to Defendant by Auslander. Trial Transcript ("Tr.") at 4. Defendant was a Broadway producer who was putting together a show to be named "Harmony on Broadway." Tr. 4. Auslander thought Plaintiff would be interested in investing. *Id.* Plaintiff met with Defendant in summer 2003 at Sardi's restaurant in Manhattan. Tr. 5. Prior to that meeting, Defendant had called Plaintiff to discuss the show, explaining that Barry Manilow had written the music for it, and Barry Sussman had written the book. Tr. 5. Plaintiff and Defendant had another meeting a few weeks later during which Plaintiff introduced Defendant to a colleague who also expressed an interest in investing. Tr. 6.

In late September of 2003, Plaintiff invested $100,000 in Harmony on Broadway LLC. Tr. 6. The funds were wired through Auslander to an account for Harmony on Broadway LLC at JP Morgan Chase, located at 3 Times Square, New York, New York. Tr. 8. He then received a packet in the mail showing him to be a limited partner in the LLC. Tr. 8. Plaintiff's ultimate return would be determined by the show's profits and the final number of investors. Tr. 9.

Defendant solicited additional monies from Plaintiff. Tr. 6. According to Plaintiff, Defendant was anticipating funding from Barry Manilow's record company, Concord Records, and was looking for investors to provide short-term loans until that money came in. Tr. 9-10.

Plaintiff alleges that, on October 3, 2003, he made a loan of $100,000 to Defendant. Tr. 36. According to Plaintiff, Defendant requested the loan as a short-term, personal loan until other investments were received. Tr. 10. Plaintiff testified that Defendant was willing to provide a lien on his residence in Florida to secure the loan and provide Plaintiff with ten percent interest over the life of the loan. *Id*. According to Plaintiff, Defendant's girlfriend, a Florida attorney, would draft the security document for the loan. Tr. 11. Defendant claimed that he had provided a similar security document for a larger investment and would do the same for Plaintiff. *Id*.

Similar to the money-transfer process for the investment in the play, the funds were wired from Auslander to an account for Harmony on Broadway LLC. Tr. 13. Plaintiff testified that Defendant needed the money right away to keep the show in business and that time was of the essence. Tr. 13, Tr. 15. Auslander testified that the money was wired to an account for Harmony on Broadway LLC in the interests of time, due to the protocols of Charles Schwab and Company requiring three to five business days to set up wiring instructions for a new account. Tr. 48. According to Auslander, Defendant would not have accepted anything but a personal loan at the

3

time the second investment was made because Defendant did not want to dilute his interest in the production by selling additional units to investors. Tr. 46-47. Furthermore, Auslander stated that Defendant told him that he was "incredibly relieved and very thankful" for the personal loan and admitted to him that Plaintiff "bailed him out and bellied up to the bar." Tr. 49.

On October 27, 2003 Plaintiff emailed Defendant inquiring why he had not yet received the document securing the "$100,000 personal loan that [Defendant] guaranteed with [his] home as collateral." Plaintiff Exhibit ("P. Ex.") 7. Defendant responded to Plaintiff on October 27, 2003 stating, "I agree with you corey [sic], and called you this morning, left a message at yor [sic] home and on your cell, I'll take care of it, promise and sorry you have been great! and you have my word, which is most important." P. Ex. 8. Plaintiff never received legal documentation securing the loan nor any documentation evidencing that the loan was a corporate debt. Tr. 17-18.

Defendant failed to secure financing from Concord Records and the show closed before it was opened. Tr. 18. Plaintiff, like the other investors in the production, lost his $100,000 investment in the show without recovering any money. Tr. 18-19. Plaintiff testified that subsequent to the show closure, Barry Manilow and Bruce Sussman commenced litigation to secure their rights to the show and succeeded in securing those rights. Tr. 19. The producers and investors of the show then sued to win those rights back from Manilow and Sussman, but their claims were denied because they were not filed on time. Tr. 19-20. Subsequently, a legal malpractice suit was commenced by the producers against their former attorney, Robert Barandes. Tr. 20. Plaintiff testified that Defendant acted as a "conduit" between the lawyers and the investors throughout the litigation. *Id*.

4

On January 16, 2007, Plaintiff emailed Defendant, admonishing him for failing to respond to Plaintiff's emails, inquiring about his plans to repay the $100,000 personal loan, and threatening to bring legal action if Defendant did not repay the debt. P. Ex. 9. Defendant responded on January 17, 2007 indicating that he had been out of the country for two weeks with limited access to email and that Plaintiff's loan would be repaid regardless of the outcome of the pending litigation. P. Ex. 10.

Plaintiff sent a follow-up email to Defendant on May 30, 2007 requesting a definitive date for the repayment of the loan. Tr. 22., P. Ex. 11. When he did not receive a response from Defendant, Plaintiff sent another email to Defendant on June 6, 2007, copying both Auslander and Plaintiff's attorney, Kenneth Elan. Tr. 23, P. Ex. 12. Plaintiff informed Defendant that he would no longer informally request the repayment of his loan and had hired an attorney to ensure the loan was repaid. *Id*. Defendant responded to Plaintiff later that day apologizing for his delay in correspondence and informing Plaintiff that he would call on Saturday. Tr. 24, P. Ex. 13.

On July 6, 2007, Plaintiff sent yet another email to Defendant reiterating that he had made a personal loan to Defendant, not a priority loan to Harmony on Broadway LLC, and informing Defendant that he planned to file suit against him the following Monday. P. Ex. 15. Defendant responded on the evening of July 6, 2007 denying for the first time that Plaintiff made a personal loan to him. P. Ex. 16. Instead, Defendant declared that Plaintiff had made a priority loan to Harmony on Broadway LLC, which would not be paid back before the completion of the ongoing litigation. *Id*. Defendant never repaid any money to Plaintiff. Tr. 30. This action ensued.

**III. CONCLUSIONS OF LAW**

To recover for a breach of contract, Plaintiff must establish by a preponderance of the evidence: "(1) the existence of an agreement; (2) the adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. Of N.Y., 375 F.3d 168, 177 (2d Cir. 2004).  Here, the alleged contract was oral, and New York law recognizes the existence of oral contracts. Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80 (2d Cir. 1985). A four factor test is used to determine whether the parties intended to be bound by their oral agreement: (1) whether there has been an express reservation between the parties not to be bound absent a formal writing; (2) whether one party has partially performed the contact; (3)whether there are material terms left to be negotiated; and (4) whether it is the type of agreement that is usually reduced to a writing. The Haskell Co. v. Radiant Energy Corp., No. 00-CV-04403, 2007 WL 2746903, *8 (E.D.N.Y. Sept. 19, 2007). "No single factor is decisive, but each provides significant guidance." Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 323 (2d. Cir. 1997). The intent of the parties is determined from the totality of the circumstances. Shaftel v. Dadras, 39 F. Supp. 2d 217, 225 (E.D.N.Y. 1999).

Here, the facts support the finding, as to the first two prongs of the test, that both parties' intended to be bound by the oral agreement. Addressing the first prong, there is no evidence in the record that suggests either party expressed a reservation about being bound by the oral agreement. Although they discussed reducing the agreement to writing, the parties both acknowledged and acted on the terms of the agreement without such writing. In fact, Defendant stated that his word was "most important" when discussing his obligations under oral contract.

6

Furthermore, Plaintiff fully performed his obligations under the loan by wiring the $100,000, thus satisfying the second prong.

With regard to the third prong, the Court finds that Plaintiff has demonstrated that the material terms of the contract were agreed upon by the parties at the time the contract was formed. The email exchange between the parties on October 27, 2003 evidences a fundamental consensus between the parties on the material terms of the agreement. Though Defendant later denied that the loan created personal liability, his denial was four years after the consummation of the agreement and at a time that benefitted his personal position; it thus fails to persuade the Court that material terms of the agreement were left open for negotiation.

Finally, the Court finds that this agreement is not the type of agreement that is usually reduced to writing. The Second Circuit has "found that the complexity of the underlying agreement is an indication of whether the parties reasonably could have expected to bind themselves orally." Ciaramella, 131 F.3d at 326. This was not a complicated transaction: a $100,000 loan at 10% interest over the life of the loan with Defendant's property in Florida as collateral. Furthermore, the personal relationship between the parties, their informal discussions over email, and Defendant's assurances that his word was "most important" indicate that this was not the type of agreement normally reduced to writing. Thus, the four prongs of the test lead to the finding that the parties intended to be bound by their oral agreement.

I note that Judge Seybert had earlier denied summary judgment to Plaintiff, finding that material issues of fact existed with regard to the issues of mutual assent and acceptance between the parties. In making that ruling, however, Judge Seybert had to defer to the procedural rule to "resolve all permissible factual inferences in favor of the party against whom summary judgment

is sought." The trier of fact at trial is not similarly constrained, and I find that, based on the record and evidence received at trial, the issues of material fact remaining from summary judgment have been resolved in favor of a finding that both parties accepted and mutually assented to the terms of the oral contract.

"To form a valid contract requires an offer, acceptance, consideration, mutual assent and intent to be bound." Leibowitz v. Cornell University, 584 F.3d 487, 507 (2d. Cir. 2009). In other words, there must be "an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." Tractelbel Energy Marketing, Inc. v. AEP Power Marketing, Inc., 487 F.3d 89, 95 (2d Cir.2007).

"The manifestation of expression of assent necessary to form a contract may be by word, act, or *conduct* which evinces the intention of the parties to contract." Leibowitz, 584 F.3d at 507 (citing Maffea v. Ippolito, 668 N.Y.S.2d 653, 654 (1998)) (emphasis added). Thus, a party's conduct can indicate assent when "he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." Restatement (Second) of Contracts § 19(2) (1981). Furthermore, under New York law, "courts will find that a contract is created when the offeree engages in ambiguous conduct that leads an offeror to believe that the offeree has assented to the deal." Int'l Bus. Mach. Corp. v. Johnson, 629 F.Supp.2d 321, 331 (E.D.N.Y. 2009).

New York principles on acceptance through silence and conduct are similarly well founded. Section 69(1) of the Restatement (Second) of Contracts provides:

> (1) Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases only:

> (a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.
>
> (b) Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.
>
> (c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

Restatement (Second) of Contracts § 69(1). In accordance with subsection (c), however, New York recognizes that "[w]hen a party is under a duty to speak, or when his failure to speak is inconsistent with honest dealings and misleads another, then his silence may be deemed to be acquiescence." Tanenbaum Textile Co. v. Schlanger, 287 N.Y. 400, 404 (1942). Additionally, "a party's silence will be deemed an acquiescence where he or she is under such a duty to speak that his or her conduct, accompanied by silence, would be deceptive and beguiling and failure to speak therefore misleads the other party." Russell v. Raynes Assocs. Ltd. P'ship, 569 N.Y.S.2d 409, 414 (App. Div. 1991) (internal quotation omitted). "Such a duty may be created by a course of conduct . . . which gives the offeror reason to understand that silence will constitute acceptance." Id.

The court finds that Plaintiff has established, by a preponderance of the evidence, that Defendant assented to the terms of the contract as outlined in his emails. The court finds Plaintiff's testimony regarding the chain of events – his meetings with Defendant regarding an investment in Harmony on Broadway LLC, his initial investment in Harmony on Broadway LLC, his subsequent personal loan to Defendant during a time of financial distress, and his reliance on Defendant's silence when presented with clear language concerning the personal loan – supports

the finding that Plaintiff made a personal loan of $100,000 to Defendant. Auslander's testimony further supports this finding by corroborating Plaintiff's testimony, explaining why the loan was wired to a bank account for Harmony on Broadway LLC instead of Defendant's personal account, and detailing Defendant's rationale for seeking a personal, not corporate loan.

Based on the evidence, the court finds that Defendant accepted a personal loan from Plaintiff on October 3, 2003 and the subsequent emails sent to Defendant were meant to confirm the terms of the agreement previously negotiated. The October 27, 2003 email exchange between Plaintiff and Defendant, along with the testimony of both Plaintiff and Auslander, evidence the mutual assent to a personal loan between the parties and Defendant's promise to pay according to the terms outlined by Plaintiff. As stated above, Defendant failed to appear at the trial, and thus Plaintiff did not have the opportunity to cross-examine the Defendant as to his personal credibility and the veracity of his claims. Defendant relies solely on his submission in Opposition to the Proposed Finding of Facts and Conclusions of Law which, even if filed in a timely manner, would not be sufficient to overcome the credible and persuasive evidence presented by Plaintiff at trial. Thus, a valid contract was formed by the parties and Defendant is personally liable for the loan.

## IV. ORDER

For all the foregoing reasons, the court finds in favor of the Plaintiff. The clerk of the court shall enter judgment for $100,000, plus 10% interest from October 3, 2003 to the date of this order.

Dated:  Central Islip, New York                    SO ORDERED:
        December 16, 2011

/s/William D. Wall  
WILLIAM D. WALL  
United States Magistrate Judge